**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **BRIGHTVIEW GROUP, LP,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No.: SAG-21-3027 |
| | * | |
| **MICHAEL P. GLYNN,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

*   *   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM OPINION

Plaintiff Brightview Group, LP ("Brightview") filed a Complaint against Defendant Michael P. Glynn ("Glynn"), seeking redress for alleged misappropriation of its trade secrets, tortious interference with business, inducement to breach fiduciary duties, and conspiracy. ECF 1. Glynn filed a Motion to Dismiss the Complaint for failure to state a claim and for lack of personal jurisdiction ("Motion"). ECF 9. Brightview opposed the Motion, ECF 10, and Glynn filed a reply, ECF 13. While that Motion was pending, Brightview filed a Motion for Leave to File Surreply, ECF 14, which Glynn opposed, ECF 15. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons stated below, Glynn's Motion to Dismiss, ECF 9, will be granted and Brightview's Motion to File Surreply, ECF 14, will also be granted.

## I.    FACTUAL AND PROCEDURAL HISTORY

The alleged facts in this case are substantially similar to those set forth in detail in this Court's earlier Memorandum Opinions in *Brightview Group, LP v. Andrew M. Teeters, et al.*, No. 20-cv-19-2774 (D. Md. Sep. 19, 2019) ("*Brightview I*"), ECF 95, ECF 151, ECF 205, and will not

be fully reiterated herein.  This section will be limited to a review of certain relevant factual allegations, the procedural history of *Brightview I*, and proceedings in the instant case.[1]

### A.  Factual Background

Brightview is a developer and operator of senior living communities along the Mid-Atlantic coast in Maryland, Virginia, Pennsylvania, New Jersey, New York, Connecticut, Massachusetts, and Rhode Island.  ECF 1 ¶¶ 6, 9.  Brightview's communities offer a variety of accommodations for residents of differing needs, including independent living, assisted living, enhanced care, and specialized care.  *Id.* ¶ 8.

Glynn is a resident of New York and a former Brightview employee.  ECF 1 ¶ 2.  Glynn began working for Brightview in 2010, first as a consultant and later as a developer.  *Id.* ¶ 12.  In 2015, Glynn left Brightview to take a position at National Development, a Brightview competitor based in Boston, Massachusetts.  *Id.* ¶ 14.  After leaving Brightview, Glynn remained in touch with two then-Brightview employees, Andrew Teeters and Ross Dingman.  *Id.* ¶ 15.  Teeters began his employment with Brightview in 2006 as a Development Director, and left Brightview at the end of July, 2019.  *Brightview I*, ECF 95 at 3.  For his part, Dingman worked for Brightview from August, 1998 through August, 2019.  *Id.*  During his tenure at Brightview, Dingman received several promotions, advancing finally to the role of Vice President of Operations in 2012.  *Id.*

In summer, 2018, Glynn, Teeters, and Dingman began discussions about starting their own senior housing company.  ECF 1 ¶ 16.  In July, 2018, Teeters emailed Glynn a "Conceptual Business Plan," and by August, 2018, Glynn, Dingman, and Teeters were "swapping draft income

---

[1] For purposes of resolving a motion to dismiss on the grounds of res judicata or the claim splitting doctrine, courts may take judicial notice of facts from a prior judicial proceeding where, as here, the res judicata defense raises no disputed issue of fact.  *Q Int'l Courier Inc. v. Smoak*, 441 F.3d 214, 216 (4th Cir. 2006) (citing *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000)).

statements and company structure documents." *Id.* ¶¶ 17-20.  On September 29, 2018, Teeters emailed Dingman and Glynn a "sample underwriting" for a hypothetical new senior living development project, which was created using Brightview's underwriting system.  *Id.* ¶¶ 17-22. As a former Brightview developer, "Glynn was well aware of the value Brightview places on the underwriting system and equally well aware that Brightview restricts access to the underwriting system within the company."  *Id.* ¶ 24.

By fall, 2018, Glynn, Dingman, and Teeters had initiated efforts to pitch their new venture to potential partners and investors.  *Id.* ¶ 26.  In September, 2018, upon Glynn's suggestion, Teeters transmitted to a National Development affiliate a "prospective development pipeline list for Maryland and Virginia," which included project sites that Teeters had been evaluating in his capacity as a Brightview developer.  *Id.* ¶¶ 27-28, 33.  Glynn also arranged a pitch meeting with National Development in January, 2019, in which Glynn, Dingman, and Teeters shared materials derived from Brightview's confidential internal materials.  *Id.* ¶¶ 37-39, 42.  The following month, in February, 2019, Glynn sent confidential Brightview materials to Kevin Kelly of Sequoia Heritage, a private equity firm.  *Id.* ¶ 44.  Before sending the materials, Glynn required Kelly to execute a nondisclosure agreement because Dingman and Teeters had "not yet informed their employer about the plans."  *Id.* ¶ 45.

As part of these efforts, Glynn reached out to Mark Stebbins, then-CEO of PROCON, Inc. ("PROCON"), an architecture, engineering, and development firm, and longtime Brightview partner.  *Id.* ¶ 47.  Teeters, Dingman, and Glynn pitched their new venture to Stebbins in April, 2019, at which point Stebbins stated that he needed "a lot more detail" because the proposal did not appear profitable enough.  *Id*. ¶ 48.  In response, Glynn provided Stebbins a copy of an underwriting prepared using Brightview's model.  *Id.* ¶ 50.  Despite Stebbins's initial hesitancy,

his negotiations with Teeters, Dingman, and Glynn continued.  On May 11, 2019, Glynn sent Stebbins "an updated term sheet," and by the end of June, 2019, they were exchanging comprehensive drafts of an operating agreement for their partnership.  *Id.* ¶ 53.

While they were seeking capital investors, Teeters, Dingman, and Glynn were also exploring the feasibility of acquiring various sites along the east coast.  Pursuant to this effort, Glynn, Dingman, and Teeters exchanged and reviewed demographic materials for various sites in Connecticut, Maryland, New Hampshire, New Jersey, and New York, which had been prepared by a then-Brightview financial analyst.  *Id.* ¶¶ 70-72.  In May and June, 2019, Glynn, Dingman, and Teeters began discussions with a real estate development firm, Hogan Companies, to acquire real property in Pasadena and Annapolis, Maryland.  *Id.* ¶ 60.  Glynn, Dingman, and Teeters utilized Brightview materials to further these efforts.  *Id.* ¶ 61 ("Hogan used the Brightview Crofton footprint as a 'placeholder' for a special exception application for the Pasadena site, and Teeters sent PROCON the Brightview Crofton schematic design, with copy to Glynn.").  At the end of June, 2019, Teeters submitted a letter of intent to Hogan to purchase the Pasadena, Maryland site.  *Id.* ¶ 90.  During this period, Glynn also became interested in a Montville, New Jersey site. *Id.* ¶ 75.  In June, 2019, Glynn emailed Teeters and Dingman to share that he had verbally negotiated terms for the Montville site, notwithstanding Glynn's knowledge that a Brightview developer, Dave Holland, was keenly interested in acquiring the site for Brightview.  *Id.* ¶¶ 75-79 ("Back in June 2019, though, Glynn had warned Teeters and Dingman that Brightview developer David Holland was 'hot on this' Montville site.").

Glynn incorporated Monarch Communities, LLC ("Monarch") in Delaware on July 10, 2019.  *Id.* ¶ 94.  One of Monarch's members is "RAM HoldCo, LLC," a Delaware entity of which Glynn, Dingman, and Teeters are members.  *Brightview I*, ECF 95 at 4; *see also* ECF 1 at 4 ("Glynn

executed an LOI to purchase Montville as an 'Authorized Member' of Monarch, a 'start-up' company consisting of . . . Michael Glynn, Andrew Teeters, Ross Dingman, and Mark Stebbins.'").   In July, 2019, Brightview informed Dingman that his employment would be terminated.  ECF 1 ¶ 92.  That same month, Teeters announced his intention to resign and was subsequently terminated.  *Id.* ¶¶ 101-02.

### B. Prior Litigation

Brightview filed suit against Teeters, Dingman, and Monarch in this Court on September 19, 2019, seeking injunctive and monetary relief for their alleged misappropriation of its trade secrets in violation of state and federal law, their alleged breach of fiduciary duties, and unfair competition under Maryland law.  *Brightview I*, ECF 1.  The same day, Brightview also filed an emergency motion for temporary restraining order and preliminary injunction.  *Brightview I*, ECF 3.  On September 26, 2019, this Court ordered expedited discovery, *Brightview I*, ECF 19, in advance of a preliminary injunction hearing to be held on January 16, 2020, *Brightview I*, ECF 77.  On November 5, 2019, prior to the preliminary injunction hearing, Brightview filed an amended complaint, *Brightview I*, ECF 38.  As with its initial complaint, Brightview did not name Glynn as a defendant in its amended complaint, despite identifying him as the incorporator and beneficial owner of Monarch, and despite including several substantive allegations regarding his alleged receipt of trade secrets.  *See id.* ¶¶ 83, 86-87, 101.  On February 21, 2020, this Court entered a preliminary injunction enjoining Teeters, Dingman, Monarch, and all persons in concert with them who received actual notice of the order from accessing, using, disclosing, or disseminating certain documents that were shown to be trade secrets or to otherwise contain Brightview's confidential or proprietary business information.  *Brightview I*, ECF 91; *see also* ECF 1 ¶ 134.  This Court subsequently entered a standard scheduling order which provided in relevant part that any

amendment of pleadings must occur before April 6, 2020, and that that the discovery deadline would be July 6, 2020. *Brightview I*, ECF 93 at 2.

Meanwhile, in October, 2019, roughly one month after *Brightview I* was filed, Stebbins informed Brightview of his intention to "sling 'mud'" at it if it did not halt litigation. *Id.* ¶¶ 111-15. Consistent with his alleged threat, in November, 2019, "Stebbins, acting through his investment vehicle Triple C Real Estate Investments, LLC ["Triple C"], and in conjunction with Glynn, Teeters, and Dingman, filed a lawsuit against two Brightview-affiliated investment entities in state court in New Hampshire, seeking access to confidential Brightview information, including investor lists." *Id.* ¶ 116. The suit was subsequently dismissed. *Id.* ¶ 117. Triple C also unsuccessfully sought access to Brightview's books and records in an arbitration before the American Arbitration Association. *Id.* ¶¶ 118-20. In that action, the arbitrator ultimately denied Triple C's request and awarded attorneys' fees and costs to Brightview. *Id.* ¶ 122. Triple C also submitted a complaint against Brightview to the New Hampshire Bureau of Securities Litigation, triggering an investigation that has since been closed. *Id.* ¶¶ 124-29. Brightview alleges that it incurred nearly $200,000 in attorneys' fees and costs in responding to that investigation.

On May 19, 2020, Brightview sought leave to file a proposed second amended complaint ("PSAC"). *Brightview I*, ECF 133. In relevant part, the PSAC would add supplemental facts regarding Stebbins, namely, that he was persuaded to partner with Teeters, Dingman, and Monarch due to their use of Brightview's confidential information, and that he had initiated a "mudslinging" campaign in response to Brightview's filing of its lawsuit. *Brightview I*, ECF 151 at 4-5. The PSAC also sought to supplement its damages claims in Counts I and II to include "the costs and expenses, including reasonable attorneys' fees, that it has incurred in defending against the Monarch co-conspirators' mud slinging [*sic*] campaign including the New Hampshire litigation,

the subsequent arbitration, and the securities investigation . . ." *Id.* at 3-4 (quoting *Brightview I*, ECF 133 ¶¶ 139(F), 146(F)). Finally, the PSAC would have alleged that "Teeters and Dingman, together with their co-conspirator Michael Glynn" tortiously interfered with Brightview's business relationship with Stebbins and PROCON and enabled Stebbins to commence his mudslinging campaign. *Id.* at 4 (quoting *Brightview I*, ECF 133 ¶¶ 174-85). The PSAC did not seek to add Glynn or any other party as a defendant.

In July, 2020, this Court denied Brightview's motion to amend pursuant to Federal Rule of Civil Procedure 16(b)(4) as untimely and not excused for good cause. *Brightview I*, ECF 151, ECF 152. As an initial matter, the Court determined that Brightview's motion must be analyzed under Rule 16's "good cause" standard because it was filed after the deadline to amend pleadings had passed. The Court determined that Brightview had notice of most of the facts alleged in the PSAC at the time it filed its amended complaint in November, 2019, roughly five months in advance of the deadline to amend pleadings. *Id.* at 11. Given this abundant notice, the Court was not satisfied by Brightview's cursory explanation for its failure to timely amend, which did not support a finding of diligence. *Id.* at 12; *see also id.* at 10 (quoting *Cook v. Howard*, 484 F. App'x. 805, 815 (4th Cir. 2012) ("To establish good cause, the party seeking to amend the scheduling order must 'show that the deadlines cannot reasonably be met despite the party's diligence.'"). Although not necessary to its holding, the Court also observed that Brightview's amendment may have failed even under the more liberal standard enumerated in Rule 15, which counsels that amendments may be denied for futility. *Id.* at 14. Specifically, the Court observed that the relevant trade secrets statutes would be unlikely to permit Brightview to recover attorneys' fees incurred in collateral litigation against Stebbins or Triple C, neither of whom are parties to the suit. *Id.* With regards to its proposed claim for tortious interference with business relations, the Court also

doubted that Brightview could establish that Stebbins's alleged mudslinging campaign was caused by Teeters's and Dingman's alleged interference.  The Court mused in closing that "[i]f Brightview seeks relief for damages caused by Stebbins's 'mudslinging' campaign, Brightview is free to pursue relief against Stebbins in another lawsuit."  *Id*. at 15.

On March 29, 2021, the Court granted in part and denied in part the parties' cross-motions for summary judgment.  ECF 1 ¶ 137-40 (citing *Brightview I*, ECF 205).  The parties subsequently engaged in negotiations, resulting in a settlement order dismissing the case in July, 2021.  *See Brightview I*, ECF 209.  The parties ultimately failed to consummate the settlement, however, and the case was reopened in October, 2021.  *Brightview I*, ECF 213.  On November 16, 2021, this Court scheduled a jury trial in *Brightview I*, which is set to commence in September, 2022.  *Brightview I*, ECF 216.

### C.  The Current Dispute

On November 24, 2021—roughly one week after this Court scheduled the trial in *Brightview I*—Brightview filed the instant lawsuit against Glynn.  ECF 1.  The Complaint largely echoes the factual allegations in *Brightview I*'s amended complaint except insofar as it incorporates supplemental allegations regarding Stebbins, which this Court prohibited Brightview from inserting into *Brightview I* via its PSAC.  The Complaint alleges seven claims for relief: misappropriation of trade secrets in violation of federal law (Count I); aiding and abetting breaches of fiduciary duty under New York common law (Count II); tortious interference with prospective economic advantage under New York common law (Count III); tortious interference with business relations under New York common law (Count IV); civil conspiracy under New York common law (Count V); conduct of Monarch's affairs through a pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count VI); and RICO conspiracy

(Count VII).  Notably, Counts I, II, and V correspond to claims leveled against the *Brightview I* defendants, *see Brightview I*, ECF 38 (alleging misappropriation of trade secrets (Counts I-II), breach of fiduciary duty (Count III) and civil conspiracy (Count V)).  Likewise, Counts III-IV are analogous to claims that Brightview sought leave to file in its PSAC.  *See Brightview I*, ECF 132 (alleging tortious interference with business relations (Count VII)).  Brightview also alleges two causes of action against Glynn under RICO (Counts VI-VII), which it did not bring against any *Brightview I* defendants.  The RICO claims, however, are premised on the same facts as the above claims, simply alleging that Monarch constitutes the "enterprise" engaged in racketeering activity (namely, the misappropriation of trade secrets) through the actions of Teeters, Dingman, and Glynn.  Glynn now moves for dismissal of the Complaint with prejudice, ECF 9.

## II.   MOTION FOR LEAVE TO FILE SURREPLY

After Glynn's Motion was fully briefed, Brightview submitted a Motion to File Surreply, ECF 14, attaching its proposed surreply brief as an exhibit, ECF 14-1.  Surreplies may be appropriate when the party seeking to file a surreply "would be unable to contest matters presented to the court for the first time in the opposing party's reply."  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003).  Courts may deny leave to file a surreply, however, where a party "seek[s] merely to re-open briefing on issues" already raised.  *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 467 (D. Md. 2008).

Brightview argues that a surreply is warranted because Glynn did not address *Taylor v. Sturgell*, 553 U.S. 880 (2008), until his reply brief, and his "citation to new cases prejudices Brightview by denying it an opportunity to explain why these cases do not control."  ECF 14 at 1 (quoting *Stewart v. Jayco, Inc.*, 2017 WL 193296, at *3 (D. Md. Jan. 18, 2017) ("A surreply may

be permitted when the party opposing the underlying motion 'would be unable to contest matters presented to the court for the first time in the [movant's] reply.'").

Brightview's argument is somewhat strained, given that Glynn did not present an argument regarding *Taylor*, 553 U.S. at 880, in its opening brief for an exceedingly understandable reason: he apparently did not believe the case to be relevant to the instant dispute. Moreover, when Glynn did address *Taylor* and its progeny in his reply brief, he did so in direct response to an argument raised by Brightview, and even then, only to assert that *Taylor* is inapplicable. Nevertheless, the Court acknowledges that Glynn's reply memorandum raised a number of cases subsequent to *Taylor*, which Brightview contends merit a response. In the interest of deciding all of the issues in this case on their substantive merits rather than their procedural propriety, the Court will grant Brightview's Motion for Leave to File a Surreply, ECF 14. The Court has accordingly reviewed Brightview's Surreply memorandum, ECF 14-1, and has considered the arguments raised therein.

## III.   MOTION TO DISMISS

### A.   Legal Standard

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). That rule provides that a complaint must

contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The

purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds"

for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), a complaint must

contain facts sufficient to "state a claim to relief that is plausible on its face."  *Id.* at 570; *see*

*Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading

standard for all civil actions[.]") (quotation omitted); *see also Willner v. Dimon*, 849 F.3d 93, 112

(4th Cir. 2017).  However, a plaintiff need not include "detailed factual allegations" in order to

satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Further, federal pleading rules "do not

countenance dismissal of a complaint for imperfect statement of the legal theory supporting the

claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual

allegations contained in the complaint" and must "draw all reasonable inferences [from those facts]

in favor of the plaintiff."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440

(4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017);

*Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650

F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011).  However, a court is not required

to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from

the factual allegations, assuming the truth of only the factual allegations, and then determining

whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the

legal remedy sought.  *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert.*

*denied*, 566 U.S. 937 (2012).

Glynn asserts that dismissal is required under the claim splitting doctrine. A motion to dismiss asserting a violation of the claim splitting doctrine is properly raised under Fed. R. Civ. P. 12(b)(6). *See Kashyap, LLC v. Nat. Wellness USA, Inc.*, 2011 WL 2462192, at *3 (D. Md. June 16, 2011); *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 452 F. Supp. 2d 621 (D. Md. 2006) ("*Sensormatic III*"). "Although a motion premised on claim-splitting requires a court to consider facts beyond the complaint, a court may take judicial notice of facts from a prior judicial proceeding so long as the affirmative defense does not raise a disputed issue of fact." *Kashyap*, 2011 WL 2462192 at *3 (citing *Q Int'l Courier Inc. v. Smoak*, 441 F.3d 214, 216 (4th Cir. 2006)).

## B.  Analysis

Glynn's Motion is based upon three grounds. First, Glynn argues that dismissal is warranted because the instant action violates the rule against claim splitting. Second, Glynn asserts that the Complaint fails to state a claim upon which relief may be granted. Finally, Glynn contends that this Court lacks personal jurisdiction over him. Glynn's first argument carries the day, and is dispositive of the Motion in its entirety.[2]

### 1.  Claim Splitting

The rule against claim splitting "prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 F. App'x 256, 265 (4th Cir. 2008) ("*Sensormatic IV*") (quoting *Myers v. Colgate-Palmolive Co.*, 102 F. Supp. 2d 1208, 1224 (D. Kan. 2000)). "The rule against claim splitting is based on the same principles as res judicata . . . and . . . applies when, like here, two suits are pending at the same time." *Sensormatic III*, 452 F. Supp. 2d at 626 n.2. The prohibition on claim splitting fosters judicial economy and protects parties from "the vexation of

---

[2] In light of the conclusion that that the prohibition against claim splitting is determinative of Glynn's Motion, this Court finds it unnecessary to consider his latter two arguments.

concurrent litigation over the same subject matter." *Alston v. Experian Info. Sols., Inc.*, 2016 WL 901249, at *3 (D. Md. Mar. 3, 2016), *aff'd*, 680 F. App'x 243 (4th Cir. 2017).  The doctrine is intended in part "to prohibit plaintiffs from 'circumventing' a court's earlier ruling." *Chihota v. Fulton, Friedman & Gullace, LLP*, 2012 WL 6086860, at *3 (D. Md. Dec. 5, 2012); *see also Sensormatic IV*, 273 F. App'x at 265 ("Often, the rule against claim splitting applies to prevent a plaintiff from filing a new lawsuit after the court in an earlier action has denied the plaintiff's request for leave to amend to add the claims later asserted in the second lawsuit.").

The rule against claim splitting acts to bar successive litigation if it: (1) "involves the same parties or their privies," and (2) "'arises out of the same transaction or series of transactions' as the first claim." *Sensormatic III*, 452 F. Supp. 2d at 626.  The Court's central inquiry is whether the second suit raises issues that could and should have been brought in the first.  *Lacy v. Nat'l R.R. Passenger Corp.*, 2014 WL 6967957, at *6 (D. Md. Dec. 8, 2014) (unpublished), *aff'd*, 600 F. App'x 127 (4th Cir. 2015); *see also Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 329 F. Supp. 2d 574, 582 (D. Md. 2004) ("*Sensormatic II*").  If the rule against claim splitting applies, a court may stay the second suit, dismiss the suit, or consolidate the actions.  *Mason v. Montgomery County*, 2015 WL 3891808 (D. Md. June 23, 2015).

Glynn contends that the instant action presents an axiomatic violation of the rule against claim splitting.  Brightview, for its part, resists the claim splitting doctrine by asserting that: (1) Glynn does not fall within any of the *Taylor* exceptions; (2) relatedly, Glynn is not privies with the *Brightview I* defendants; and (3) Brightview could not reasonably have brought its claims against Glynn in *Brightview I*.[3]  Finally, Brightview posits that even if the doctrine against claim

---

[3] In its opposition, Brightview did not dispute that the instant action arises out of the same transaction or series of transactions as *Brightview I*.

splitting is implicated, dismissal is an inappropriate remedy.  Brightview's arguments on each of these points fail, and this Court will address each in turn.

### i.    Applicability of *Taylor v. Sturgell*

As an initial matter, the parties vigorously dispute the applicable framework for determining whether Glynn is privies with the *Brightview I* defendants for purposes of the rule against claim splitting.   In its Motion, Glynn analyzed his relationship to the *Brightview I* defendants using traditional background principles of privity in the context of res judicata.   In contrast, Brightview insists that Glynn may only assert the preclusive effect of *Brightview I* if he can demonstrate that he falls within one of the six narrow exceptions to the rule against nonparty preclusion enumerated in *Taylor*, 553 U.S. at 880.   On this point, Brightview is incorrect.

The bounds of *Taylor* are well illustrated by the circumstances in which it arose.   The facts underlying *Taylor* began when Greg Herrick, an antique aircraft enthusiast, filed an unsuccessful lawsuit against the Federal Aviation Administration ("FAA") seeking the release of certain technical documents pursuant to the Freedom of Information Act ("FOIA").   553 U.S. at 885-86. Less than one month after the suit was resolved, Brent Taylor, Herrick's friend and fellow aircraft enthusiast, submitted his own FOIA request for the same documents; after the FAA failed to respond, Taylor filed suit.   *Id.* at 887.   The district court held that Taylor's suit was barred by claim preclusion because although Taylor was not a party to Herrick's suit, he could be bound by the suit under a theory of virtual representation.   *Id.* at 888.   The D.C. Circuit affirmed.   *Id.* at 889.   On appeal, the Supreme Court reversed.   In its reasoning, the Supreme Court reiterated that res judicata conserves judicial resources and minimizes inconsistent decisions by "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate."   *Id.* at 892 (quoting *Montana v. United States*, 440 U.S. 147, 153-154 (1979) (alterations in *Taylor*)).   However,

because a person who was not a party to a suit generally does not have a full and fair opportunity to litigate the issues resolved therein, the Supreme Court has consistently recognized a rule against nonparty preclusion. *Id.* at 892-93; *see also id.* at 893 ("this Court has often repeated the general rule that 'one is not bound by a judgment *in personam* in a litigation in which he is not as designated as a party . . . '" (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). Although the rule against nonparty preclusion is not absolute, the Supreme Court found no support for the D.C. Circuit's broad and amorphous exception for "virtual representation." Rather, from a review of relevant precedent, the Supreme Court identified six categories of narrow exceptions that justify binding a nonparty to a judgment rendered therein. *See id.* at 893-96 (specifying six categories of recognized exceptions).

Simply put, *Taylor* delineated the limited circumstances under which a litigant could be precluded by a judgment rendered in a case in which he did not participate, a result sometimes referred to as "nonparty preclusion." *Taylor*'s exceptions to the rule against nonparty preclusion do not govern this dispute for a simple reason: this case does not involve nonparty preclusion. In *Taylor*, a defendant sought to preclude a plaintiff from "relitigating" claims that the plaintiff himself had never brought; put differently a party to a prior suit sought to invoke res judicata *against* a nonparty to the initial action. Here, by contrast, res judicata is not being asserted *against* a nonparty to the prior action, but rather *by* a nonparty seeking to bind a plaintiff to its own earlier suit. Brightview—as a party in *Brightview I*—will have a full and fair opportunity to litigate the issues and claims resolved therein. The due process and fairness concerns underlying the Supreme Court's careful delineation of enumerated exceptions in *Taylor* are therefore entirely absent from this case. *Id.* at 892-93.

Subsequent federal caselaw confirms that *Taylor* controls the circumstances under which res judicata would operate *against* a nonparty to the earlier suit. The Fourth Circuit, for its part, has clarified that:

> Notably, nonmutual collateral estoppel may be invoked either offensively, by a plaintiff who "seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party," or, as in this case, defensively, by a defendant who seeks to bar a plaintiff from relitigating an issue previously decided in its favor in a suit involving another plaintiff. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.4 (1979). It is only in the latter category—where a party to a prior judgment seeks to bind a *nonparty* to that judgment in a subsequent proceeding—that the specific, delineated categories set forth in *Taylor* come into play. *See Taylor*, 553 U.S. at 892 (setting forth explicit limitations on "[t]he application of claim and issue preclusion to *nonparties*" of the proceeding sought to be given preclusive effect (emphasis supplied)); *see also Parklane*, 439 U.S. at 327 (emphasizing the "obvious difference in position between a party who has never litigated an issue and one who has fully litigated and lost").

*E. Associated Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 578 F. App'x 165, 175 n.14 (4th Cir. 2014); *see also CentraArchy Rest. Mgmt. Co. v. Angelo*, 806 F. App'x 176, 179 (4th Cir. 2020) ("only the above-referenced [*Taylor*] exceptions allow res judicata to be invoked *against a nonparty to prior litigation*" (emphasis supplied)).[4] The Fourth Circuit's binding interpretation accords with the First, Second, and Eighth Circuits. *See Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 17 n.8 (1st Cir. 2010); *Elbert v. Carter*, 903 F.3d 779, 784 (8th Cir. 2018); *Brandon v. NPG Recs., Inc.*, 840 F. App'x 605, 609 (2d Cir. 2020) (unpublished).[5]

---

[4] Brightview argued that its surreply was necessary to explain why cases cited in Glynn's reply brief do not control. ECF 14 at 1. Noticeably absent from Brightview's surreply brief, though, is any explanation of why the Fourth Circuit precedent raised in Glynn's reply is not determinative of the issue. *See* ECF 14-1 (omitting discussion of *E. Associated Coal Co.*, 578 F. App'x at 175 n.14; *CentraArchy*, 806 F. App'x at 179).

[5] Consistent with this Court's interpretation, Brightview cites several cases that utilized *Taylor* to determine whether res judicata may be invoked *against nonparties to the initial suits*. *See Duckett v. Fuller*, 819 F.3d 740, 742 (4th Cir. 2016) ("As *a nonparty to the earlier suit*, Duckett is not precluded from pursuing the same claims on his own behalf in the instant action unless the state

Simply put, Brightview's reliance on *Taylor* is unavailing.  In the instant case, Brightview—the party against whom preclusion is sought—was a party to *Brightview I*, where it had a full and fair opportunity to select "the Monarch co-conspirators" against whom it chose to proceed.  The issue is not therefore, as Brightview insists, whether it is entitled to its own day in court, ECF 10 at 13 (quoting *Taylor*, 553 U.S. at 892-93), but whether it gets "a second bite at the apple."  *Elbert*, 903 F.3d at 784.  Accordingly, in situations such as these, federal courts subsequent to *Taylor* have continued to apply settled privity law to determine whether a plaintiff to an initial suit, in filing a subsequent action, has run afoul of the claim splitting doctrine.  *See, e.g.*, *Nathan v. Takeda Pharms. Am., Inc.*, 546 F. App'x 176 (4th Cir. 2013); *Meisner v. Zymogenetics, Inc*, 2016 WL 4858741, at *4 (D.S.C. Sept. 15, 2016), *aff'd sub nom. Meisner v. Zymogenetics, Inc.*, 697 F. App'x 218 (4th Cir. 2017).

### ii.    Privity

In the res judicata context, "[p]rivity between parties exists when the interests of one party are so identified with the interests of another that representation by one party is representation of the other's legal right."  *Nathan*, 546 F. App'x 176, 178 (4th Cir. 2013) (citing *Weinberger v. Tucker*, 510 F.3d 486, 491 (4th Cir. 2007)).  In contrast to contractual privity, privity for purposes

---

defendants are able to demonstrate that at least one of the six exceptions to the general rule against nonparty preclusion applies." (emphasis supplied)); *Anguiano-Tamayo v. Wal-Mart Assocs., Inc.*, 2019 WL 359417, at *7 (N.D. Cal. Jan. 29, 2019) (applying claim splitting doctrine *against nonparty to earlier suit*, because they fell within the *Taylor* exception for properly conducted class actions)).  In its surreply, Brightview identified two unpublished out-of-circuit district court opinions that applied *Taylor* where, as here, a nonparty defendant invoked the claim splitting doctrine against plaintiffs that were party to the prior suit.  *See FastVDO LLC v. LG Elecs. Mobilecomm U.S.A., Inc.*, 2016 WL 9526400, at *4 (S.D. Cal. Dec. 13, 2016); *Unicolors, Inc. v. Macy's, Inc.*, 2015 WL 1020101, at *4 (C.D. Cal. Mar. 6, 2015).  Neither case explained its extension of *Taylor* to controversies where the party to be precluded had a full and fair opportunity to litigate the initial judgment.  Finding these decisions lacking precedential value and contravening the great weight of authority, this Court declines to adopt their approach.

of res judicata considers the closeness of relationship and legal interests between the parties in the first and second suits. *See Meisner*, 2016 WL 4858741, at *4 (D.S.C. Sept. 15, 2016) ("For res judicata, privity 'is merely a word used to say that the relationship between one who is a party on the record and another is close enough to include that other within the res judicata.'" (quoting *Nash County Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484, 494 (4th Cir. 1981)). Courts have accordingly recognized privity between entities and their employees, *see id.* (citing *Kayzakian v. Buck*, 865 F.2d 1258 (4th Cir. 1988) (unpublished)); between entities and their subsidiaries, *see Saudi v. V. Ship Switzerland, S.A.*, 93 F. App'x 516, 520 (4th Cir. 2004) (collecting cases); and between co-conspirators, *see Airframe*, 601 F.3d at 17-18; *Davenport v. Casteen*, 878 F. Supp. 871, 876 (W.D. Va. 1995); *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 800 F. Supp. 2d 182, 193 (D.D.C. 2011), *aff'd*, 682 F.3d 1043 (D.C. Cir. 2012). In all instances, the relevant inquiry focuses not on the parties' formal titles or affiliations, but on whether the interests of the parties are precisely aligned with respect to the litigation.

The allegations in Brightview's Complaint, ECF 1, dispel any doubt that Glynn is privies with Monarch, Teeters, and Dingman, the defendants in *Brightview I*. In its Complaint, Brightview alleges that Glynn incorporated Monarch, and worked at Monarch. ECF 1 at 4, ¶¶ 215, 228. Glynn, together with Teeters and Dingman, acted functionally as—or at least represented themselves to be—Monarch's sole members. ECF 1 at 4 ("Glynn formally established a new entity, Monarch . . . and . . . executed an LOI to purchase Montville as an 'Authorized Member' of Monarch, a 'start-up' company consisting of . . . Michael Glynn, Andrew Teeters, Ross Dingman, and Mark Stebbins."); *see also Brightview I*, ECF 95 at 4 (explaining that Glynn, Dingman, and Teeters are members of "RAM HoldCo, LLC," which is, in turn, a member of Monarch). In addition to being their officer, employee, and coworker, the Complaint further

alleges that Glynn and the *Brightview I* defendants were co-conspirators. *See, e.g.*, ECF 1 at 5 ("Glynn, and his co-conspirators Teeters, Dingman, and Monarch, are not permitted to use Brightview's sensitive business information to build their competing business."); *see also id.* ¶ 202 ("As a member of the Monarch conspiracy, Glynn is liable for Teeters's tortious disclosures of confidential information . . ."). In short, this Court is satisfied that Glynn's interests are so identified with those of the *Brightview I* defendants such that they are privies for purposes of a claim splitting analysis.

In opposition, Brightview asserts that Glynn is not in privity with Monarch, both because "the majority of Glynn's known bad acts were committed before Monarch's formation," and because an employment relationship does not automatically establish privity. ECF 10 at 11. Brightview's observations, although technically accurate, do not alter this Court's analysis. It is true that some of the alleged conduct occurred prior to Glynn's incorporation of Monarch in July, 2019. Brightview cites no authority in support of its apparent contention that the privity of two parties must be judged from the earliest fact alleged in the Complaint.[6] Put differently, Brightview's emphasis on Monarch's incorporation date does not change that Glynn and Monarch are, at present, so deeply intertwined that the two share identical interests in *Brightview I*. Brightview's assertion that a "finding of '[p]rivity between an employer and employee is not automatic'" is similarly beside the point. ECF 10 at 11 (quoting *Harrison v. Buford*, 2012 WL 2064499, at *5 (S.D. W. Va. June 7, 2012)). This Court agrees that an employment relationship does not categorically establish privity in every instance for purposes of res judicata. However, where, as here, the employer is a closely held entity that was incorporated and partially owned by

---

[6] Rather, Brightview cites *Clifton v. Tomb*, 21 F.2d 893, 900 (4th Cir. 1927) for the general proposition that a corporation cannot maintain an agency relationship until after its date of organization. This principle, however, does not compel Brightview's conclusion.

the employee, and which allegedly engaged in conduct of which the employee was an intimately involved co-conspirator, such a finding is amply supported.[7]

Finally, Brightview raises policy objections against a finding of privity.  Brightview essentially argues that because res judicata seeks to "minimize[e] the possibility of inconsistent decisions," the Court cannot dismiss this case because doing so would render Glynn's potential legal liability inconsistent with that of his co-conspirators, the named defendants in *Brightview I*. ECF 10 at 12 ("The harm res judicata avoids—inconsistency—is just the harm that would follow extending claim splitting to co-conspirators.").  Brightview's position lacks merit in part because it completely overlooks the other policy goals served by the doctrine against claim splitting, including judicial economy and preventing gamesmanship by litigants seeking to circumvent a court's earlier ruling.  *See Chihota*, 2012 WL 6086860, at *3; *Airframe*, 601 F.3d at 14.  More fundamentally, the argument fails because Brightview—by choosing to exclude Glynn from the amended complaint in *Brightview I*—created the very inconsistency of which it now complains. This Court expresses no view on the strategic decisions that Brightview, like all plaintiffs, must inevitably make in prosecuting its claims.  Preclusion doctrines such as the rule against claim splitting, however, require Brightview "to live with those choices."  *See Airframe*, 601 F.3d 9 at 11.

### iii.    Knowledge of Claims

Brightview also contends that the instant action does not violate the rule against claim splitting because it could not have brought its claims against Glynn in *Brightview I*.  Specifically, Brightview claims that "[a]fter the [*Brightview I*] deadline to amend pleadings, Brightview

---

[7] Even were this Court to conclude otherwise, it would not alter the ultimate conclusion in light of this Court's findings that Glynn is also privies with Teeters and Dingman for purposes of the rule against claim splitting.

learned, among much else, four key facts exposing the extent of Glynn's wrongful conduct."  ECF 10 at 15.  First, that "Glynn arranged for the initial meeting between Stebbins and the Monarch co-conspirators."  *Id.*  Second, that "Glynn warned Teeters and Dingman that Brightview developer David Holland was 'hot on this' Montville site before they all stole it for Monarch."  *Id.*  Third, that "Glynn had potential investor representative Kevin Kelly sign a nondisclosure agreement before receiving stolen Brightview trade secrets because Teeters and Dingman 'had not yet informed their employer about the plans' to form their own company."  *Id.*  And fourth and finally, that "Glynn described their scheme after stealing Brightview's trade secrets to start their own competing enterprise as 'sitting on a rocket ship headed for a planet of fun and riches.'"  *Id.*  Brightview claims that without the benefit of these four facts, Brightview mistook Glynn "to be a somewhat peripheral player in the Monarch enterprise (at least early on), not the active promoter that he was."  *Id.*  Notably, all four facts were evidently known to Brightview at the very latest in October, 2020, at which point they were included in its memorandum in support of summary judgment submitted to this Court.  *See Brightview I*, ECF 165-1 at 5-6, 11; *see also Brightview I*, ECF 85 at 10.

It is true, of course, that "a party is not barred from bringing in a subsequent action those claims that could not have been included in the original suit—even if they are related, or arise out of, the previously filed claim."  *Sensormatic II*, 329 F. Supp. 2d at 582.  The present circumstances, however, undermine Brightview's claim that it could not have sued Glynn in *Brightview I*.  Brightview's position lacks merit both because its inflates the relevance of the supposed "key facts," and because it is pegged against an artificial and erroneous deadline.

First, even were this Court to agree that Brightview could not have included its claims against Glynn by April, 2020, it would still conclude that Brightview overemphasizes the

significance of its "four key facts" while simultaneously overlooking the vast evidentiary record presented to this Court by that time.  It is altogether reasonable that at the time Brightview filed its initial complaint and emergency motion for temporary restraining order in September, 2019, it did not, and reasonably could not, have been aware of the full scope of Glynn's alleged involvement in Dingman's and Teeters's venture.  *See Brightview I*, ECF 1; ECF 3.  Glynn's involvement in the venture was made manifest, however, with the benefit of nearly three months of expedited discovery in advance of the preliminary injunction hearing in January, 2020.  It is against this backdrop that the Court stated in February, 2020 that "[t]he current record is rife with evidence that Dingman and Teeters used Brightview proprietary and confidential information, while they were still employed by Brightview, *to begin a competing senior living business with Michael Glynn.*"  *Brightview I*, ECF 95 at 28 (emphasis supplied).  Specifically, at the time this Court entered its preliminary injunction, Brightview had demonstrated to the Court that Glynn: (1) formed Monarch and acted as a member of RAM HoldCo, LLC, *id.* at 4; (2) pitched Monarch to National Development together with Dingman and Teeters, *id.* at 12; (3) reached out to third-party investors using Brightview's proprietary information to demonstrate their entity's profitability, *id.* at 13; and (4) initiated efforts to obtain funding from Mark Stebbins, *id*.  Given the substantiality of evidence previously presented to this Court regarding Glynn's alleged participation in the scheme, Brightview's insistence that it only learned of Glynn's full scope of culpability when it discovered its four proffered facts strains credulity.  This is particularly so given that Brightview's proffered "key facts" do not significantly expand or elucidate Glynn's role in the scheme, but merely add color to the substantive allegations already implicating him.

Second, and more fundamentally, Brightview's argument becomes wholly unconvincing when stripped of the patently inaccurate assumption on which it relies—that the April, 2020

deadline to amend pleadings was the last point at which its claims against Glynn could have been included in *Brightview I*. Brightview asserts that the facts it now emphasizes only came to its attention "once Brightview received a rolling production of emails beginning on April 6, 2020 (coincidentally, the deadline for amendments to pleadings in [*Brightview I*]), and reviewed them over the succeeding weeks." ECF 10 at 14-15. Given this timeline, however, there is no justification for Brightview's failure to seek leave to include claims against Glynn at some point between April, and October, 2020. Had Brightview done so, its proposed amended complaint would have been duly considered by this Court under Federal Rules 16(b)(4) and 15(a)(2). It is true, of course, that having submitted its proposed amendment after the scheduling deadline, Brightview would have been required to establish good cause for the amendment. *See* Fed. R. Civ. P. 16(b)(4). Courts in this circuit, however, have routinely concluded that new information uncovered during the course of discovery constitutes good cause sufficient to satisfy the rigors of Rule 16, when such information is relayed to the Court promptly and diligently. *See, e.g.*, *DNCSI Sols., LLC v. Landmore Inc.*, 2020 WL 6830074, at *2 (W.D. Va. Nov. 20, 2020) (movant satisfied the good cause standard for motion for leave to file counterclaims due to newly discovered information provided in discovery); *Carlisle v. Allianz Life Ins. Co. of N. Am.*, 540 F. Supp. 3d 567, 572 (E.D. Va. 2021) (plaintiff who timely filed motion to amend after discovering new facts fulfilled Rule 16's requirements).[8] Even assuming that Brightview indeed realized the scope of Glynn's culpability upon receipt and review of discovery obtained after the scheduling deadline,

---

[8] Moreover, Brightview cannot plausibly maintain that it was somehow unaware of the procedures to amend its complaint after the scheduling deadline, given that it sought leave to do just that in May, 2020. *See Brightview I*, ECF 132-1 (PSAC). Indeed, Glynn's absence from Brightview's PSAC was sufficiently notable that this Court, in its Memorandum Opinion denying Brightview's motion to amend, felt the need to clarify his continued status as a nonparty. *Brightview I*, ECF 151 at 6 n.2 ("Glynn is still not a Defendant in this action, even under the PSAC.").

Brightview had ample opportunity—with any reasonable exercise of diligence—to seek leave to assert its claims against Glynn in *Brightview I*. Instead, Brightview apparently declined to do so for more than a year, during which time the parties fully briefed dispositive motions that were resolved by this Court, commenced settlement negotiations, closed the case, reopened the case, and agreed upon a schedule for trial. Brightview offers no credible explanation for failing to level its claims against Glynn in *Brightview I*, or for its decision to do so in a new action filed shortly after settlement talks in *Brightview I* collapsed.

In sum, this Court is thoroughly unpersuaded by Brightview's assertion that the claims leveled in its Complaint could not have been included in *Brightview I*. Brightview cannot escape the conclusion that *Brightview I* was the proper forum to raise its claims against Glynn. This Court accordingly finds that the Complaint runs afoul of the rule against claim splitting because it involves the same parties or their privies and arises from the same series of transactions as *Brightview I.*

### 2. Remedy

Having determined that the prohibition on claim splitting applies to the instant action, this Court must now fashion a remedy. *Mason*, 2015 WL 3891808, at *3 (D. Md. June 23, 2015) ("If the claim splitting doctrine applies, the Court 'may stay the second suit, dismiss it without prejudice, or consolidate the two actions.'" (quoting *Hare v. Opryland Hospitality, LLC*, 2011 WL 6153128, at *2 n. 3 (D. Md. Dec. 9, 2011)); *see also Lacy*, 2014 WL 6967957, at *7-8 (dismissing suit with prejudice on claim splitting grounds); *Chihota*, 2012 WL 6086860, at *2 (granting dismissal with prejudice and noting that "[w]hen confronted with duplicative litigation, and after weighing the equities of the case, a district court is empowered to dismiss the duplicative suit with prejudice."). In fashioning a remedy, courts balance the "interests of judicial economy and avoiding vexatious litigation" against "the plaintiff's interest in bringing the second suit." *Id.*

(quoting *Lacy*, 2014 WL 6967957, at *6). "Often, dismissal is appropriate where the plaintiff files a second suit after being denied leave to amend to add those claims to the first action." *Id.* (citing *Chihota*, 2012 WL 6086860, at *2 n.18).

Under present circumstances, "the 'interests of judicial economy and avoiding vexatious litigation' substantially outweigh [Brightview's] interest in bringing the instant suit." *Lacy*, 2014 WL 6967957, at *6. As of the filing of this Complaint, the parties have litigated Brightview's claims against Dingman, Teeters, and Monarch for nearly three years, during which time they have completed discovery, submitted dispositive motions that were resolved by this Court, and proceeded toward an upcoming trial. Although Brightview urges that this Court may conserve judicial resources by consolidating the instant case with *Brightview I*, such a remedy would still require the parties to reopen discovery and to proceed through motions practice on the new claims. "Such relitigation is the antithesis of judicial economy." *Id.*

In determining the appropriate recourse for a claim splitting violation, courts must also be mindful to "protect[] litigants against gamesmanship." *Airframe*, 601 F.3d at 14; *see also Chihota*, 2012 WL 6086860, at *2 n.18. As discussed throughout, Brightview purports to file its new action based on information obtained at some point between April, and October, 2020. Yet, Brightview conspicuously filed its Complaint in November, 2021, more than a year after its purported discovery, roughly one month after this Court reopened *Brightview I*, and only one week after *Brightview I* was scheduled for trial. *See Brightview I*, ECF 213, ECF 216. Moreover, Brightview's new action includes allegations and damages theories that are substantially identical to those the Court previously rejected for lack of diligence or good cause, *compare* ECF 1 ¶¶ 113-33, 204(B), 188-204 *with Brightview I*, ECF 151. Brightview now urges that—to the extent claim splitting applies—the appropriate remedy is to consolidate the two cases for a single trial. ECF 10

at 15 ("Were the Court were to find that claim splitting applies, it should consolidate [the cases].");

*see also* ECF 14-1 ("Here no efficiency problems exist because the Court could consolidate [the cases] and hold a single trial").  This argument proves too much.  Without ascribing any improper motive in this matter, the history suggests the exact type of gamesmanship that the doctrine against claim splitting is intended to thwart.  This Court cannot allow Brightview, intentionally or otherwise, to use the instant action to obtain some advantage in *Brightview I*, or to inject into trial the very theories that this Court previously rejected for lack of diligence.[9]

Because the interests of judicial economy and preventing vexatious litigation outweigh Brightview's interest in its successive suit, the action must be dismissed.  This Court declines Brightview's invitation to "dismiss [this case] without prejudice and with leave for Brightview to file an amended complaint that includes allegations about the discovery of the extent of Glynn's involvement in the [*Brightview I*] conspiracy."  ECF 10 at 16.  Given the facts described herein, this Court can envision no additional allegations which would plausibly excuse Brightview's failure to seek leave to add its allegations against Glynn in *Brightview I*, or would justify its decision to file its Complaint until this belated, and strategically advantageous, juncture.  Accordingly, the circumstances and balance of equities described herein require dismissal of this new action with prejudice.

---

[9] Brightview makes much of this Court's earlier statement that "Brightview is free to pursue relief against Stebbins in another lawsuit."  *Brightview* I, ECF 151 at 15.  Brightview goes so far as to suggest that "the Court would have allowed a separate suit against Stebbins," and thus, its instant Complaint is "not an attempt to circumvent the Court's previous ruling, but to act consistent with it."  ECF 10 at 14.  The statement on which Brightview relies appeared in a paragraph where the Court expressed doubt that Stebbins's alleged mudslinging campaign could be legally attributable to Teeters or Dingman.  *Brightview I*, ECF 151 at 15.  Glynn sits in the same position as Teeters or Dingman, not Stebbins, with respect to the mudslinging campaign.  In context, then, the quoted excerpt should be viewed as a caution against an attenuated theory of damages and not, as it has apparently been interpreted, an invitation to revive the same theory against Glynn.

**IV.    CONCLUSION**

For the reasons set forth above, Brightview's Motion for Leave to File Surreply, ECF 14, is granted and Glynn's Motion to Dismiss, ECF 9, is granted with prejudice.  The Clerk is directed to close the case.  A separate Order follows.


Dated: March 11, 2022                                     _____/s/_____

                                                         Stephanie A. Gallagher
                                                         United States District Judge